UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Ricky Darren Sanders, Sr., #7372, | ) C/A No. 0:06-1670-MBS-BM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Sumter County c/o William T. Noonan; | ) |
| Lee County c/o Jimmy Lacoste; | )    **REPORT AND** |
| Dr. Whitiker, SLRDC Physician; | )    **RECOMMENDATION** |
| Southeastern Service Grp Inc. c/o Annette Stalvy; | ) |
| Simon Major, Director of SLRDC; | ) |
| Lt. Nancy McMillin, Shift Head Supervisor; | ) |
| C.O. Brunson, | ) |
| | ) |
| Defendants. | |

_____

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983.

Plaintiff, a pretrial detainee at the Sumter-Lee Regional Detention Center, alleges violations of his

constitutional rights.

The Defendants Sumter County, Simon Major, Nancy McMillin and C.O. Brunson

filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P., on June 15, 2007. The

Defendants Lee County and Dr. Whitaker also filed a motion for summary judgment on that date.

The remaining Defendant Southeastern Service Group, Inc., filed a motion for summary judgment

on June 16, 2007.

As the Plaintiff is proceeding pro se, a Roseboro order was entered by the Court on

June 18, 2007, advising Plaintiff of the importance of a motion for summary judgment and of the

need for him to file an adequate response. Plaintiff was specifically advised that if he failed to

1



respond adequately, the Defendants' motions may be granted, thereby ending his case. Plaintiff thereafter filed a letter with the Court on July 30, 2007, and a response to the Defendants motions on August 6, 2007. The Defendants Sumter County, Simon Major, Nancy McMillin and C.O. Brunson thereafter filed a reply memorandum on August 13, 2007, with the remaining Defendants filing reply memoranda on August 16, 2007. Plaintiff then filed a "rebuttal" on August 21, 2007. Defendants' motions are now before the Court for disposition.[1]

### Background and Evidence

Plaintiff alleges in his verified Complaint[2] that in late August 2004 he was in the "rec. room of Ehco-Pod" when "smoke and extreme heat started coming from the adjacent laundry room". Plaintiff alleges that the laundry used industrial gas propelled dryers, and that the ventilation ducts from the laundry room "release[d]" into the rec room. Plaintiff alleges that the rec room has twenty-five (25) foot high solid block walls, a cement floor, and steel "girded" or mesh ceiling, with a steel metal door. Plaintiff alleges that when the fire started in the laundry, there were eight (8) inmates in the rec room who began to panic and started beating on the door to get the Defendant Brunson's attention. Plaintiff alleges that when Brunson saw what was going on, she ran to the CO's desk and got on the phone, and then "ran out of the pod and left us".

---

[1]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the Court.

[2]In this Circuit, verified complaints by pro se prisoners are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). Plaintiff has filed a verified Complaint. Therefore, the undersigned has considered the factual allegations set forth in the verified Complaint in issuing a recommendation in this case.

2



Plaintiff alleges that the smoke became very thick, that he could barely breathe and could not see his hands in front of his face, and that he felt weak. Plaintiff alleges that the open ceiling enabled the smoke and heat to slowly filter away until the fire was extinguished, which took about ten to fifteen minutes, and that when the smoke cleared, Brunson unlocked the door to let the inmates out.

Plaintiff alleges that he lost consciousness for a while, and that when he came to his eyes were running and he was foaming from the mouth. Plaintiff also alleges that his vision was blurred, he was weak and nauseated, and vomited. Plaintiff alleges that the inmates were allowed to take showers and change clothing, but that although he demanded medical attention, there was no nurse at hand and he did not receive any. Plaintiff alleges that he demanded to see the Defendant Lt. Nancy McMillin, but that she never came. Plaintiff alleges that he also demanded an "EMS", but was refused. Plaintiff alleges that when the nurse made her rounds the following morning, he was told he had to fill out a request form before he could see the nurse. The nurse then told him that in order to see a doctor, he would have to fill out a request form for that also. Plaintiff alleges that the nurse gave him ibuprofen, but that it took an entire week to see the doctor.

Plaintiff alleges that when he finally saw the doctor, he was told that he had a red, inflamed throat area. Plaintiff alleges that he was given medication, but that it took three months before he received x-rays and had an EKG done, and even then he had to "bond out" and do it himself. Plaintiff alleges that he had a dislocated knuckle and multiple fractures on his hand, but that the Defendant Dr. Whitaker mis-diagnosed his hand as just being swollen, and that it has therefore healed wrongfully. Plaintiff alleges that he occasionally coughs or spits up blood, that he needs surgery, and that he still experiences chest pain and some nausea. Plaintiff seeks monetary damages.



See generally, Verified Complaint.

The Defendants have collectively submitted numerous affidavits and exhibits in support of summary judgment in this case. Among these is an affidavit from the Defendant Lettie Brunson, who attests that during the time period set forth in the Complaint she was employed by the Sumter-Lee Regional Detention Center as a Correctional Officer. Brunson attests that on August 27, 2004, she was working in E-Pod when she noticed smoke coming out of the vents in the recreation yard. Brunson attests that these vents lead from the dryers in the laundry room, and serve as the exhaust for the dryers. Brunson further attests that the recreation yard is open with only chain link fencing across the ceiling, which allows any smoke to escape through the ceiling into the air. Brunson attests that when she noticed the smoke, she called Control and advised them that smoke was coming out of the vents, at which time Control opened the door to her pod so that she could go check on the problem. Brunson attests that when she left the pod to check on the problem, she advised Control to monitor the inmates in the pod while she was gone. Brunson attests that at no time were the inmates abandoned, as they were under constant supervision by the Control Room. Brunson further attests that, while there were inmates on the recreation yard, there was no problem with the smoke as it was not much smoke and was simply going straight into the sky from the vent.

Brunson attests that she went into the laundry room and saw that the smoke was coming from one of the dryers, at which time she called for the Defendant Lt. McMillin to assist her. Brunson attests that McMillin got the fire extinguisher and came to the laundry room, and that when they turned off the dryer they noted that a white bedspread had caught fire in the dryer. Brunson attests that by the time they opened the dryer door, the fire was out, and they did not even need to use the fire extinguisher. Brunson then returned to her pod, from which she had been gone for less than

4



five minutes.

Brunson attests that when she got back to the pod, she allowed the inmates to come in from the recreation yard, that there was no smoke in the recreation yard, and that none of the inmates had any problems other than that some of them said their clothes smelled like smoke. As a result, she allowed the inmates to take a shower and get new uniforms. Brunson attests that at no time was the recreation yard covered in smoke, and that visibility was never blocked in any way. Brunson further attests that no inmates appeared to have any problems from this incident, other than some of them saying that their clothing smelled like smoke, but that if an inmate had requested medical attention she would have given the inmate a medical request form. Brunson notes that Plaintiff filled out a request to see the nurse on August 27, 2004, the day of the fire, and that he was seen by medical the following day. Brunson further attests that prison records show that Plaintiff was seen by medical several more times over the next few days, although she does not recall his ever having complained of any serious problems.

Brunson attests that she plays no role in providing medical care or deciding what care an inmate needs, other than if an inmate requests medical care, she gives them a medical request form. Plaintiff received a medical request form on the date of the fire. Brunson further attests that if there was an emergency situation, she would contact her supervisor or the medical staff immediately. Further, any time an inmate requests to see a supervisor, she contacts the supervisor on duty. Brunson attests that she has never had a situation where she called her supervisor and no one responded, nor has she ever refused to allow any inmate to talk to a supervisor. Also, if an inmate requests to be seen by EMS, she contacts the supervisor or the medical department and lets them decide how to proceed. Finally, Brunson attests that she does not recall any complaints from



this incident after the inmates took a shower, nor is she aware of any damage to the Detention Center as a result of this small fire in the dryer. <u>See generally</u>, <u>Brunson Affidavit, with attached Exhibits</u>. <u>See also</u> <u>Major Affidavit, attached Exhibit A (Incident Report of Lt. McMillin)</u>.

      The Defendant McMillin has also submitted an affidavit wherein she attests that she is a lieutenant at the Sumter-Lee Regional Detention Center, and that on August 27, 2004 she was in the hallway when she heard Officer Brunson say there was a fire in the laundry room.  McMillin attests that she unlocked the fire extinguisher and went toward the laundry room, at which time she saw smoke coming from the dryer. McMillin attests that after turning off the dryer she opened the door, by which time the fire was out. It appeared that a white bedspread had apparently caught fire. McMillin attests that there was no damage done to the laundry room or the dryers, and that no repairs had to be made.  McMillin attests that after she responded to the laundry room, Officer Brunson went back to her pod.

      McMillin attests that she has had no dealings with the Plaintiff, and that if an inmate files a grievance, it is referred to the appropriate person to act on.  McMillin further attests that at the time of this incident, the Detention Center had a contract with Southeastern Service Group to provide medical care to inmates, and that if an inmate filed a medical grievance during the time Southeastern was providing medical care, it was forwarded to the medical department to respond to.  McMillin attests that, based on her review of the records, it appears that each time Plaintiff requested to see medical, he was taken to medical and medical treated him according to their procedures.  <u>See generally</u>, <u>McMillin Affidavit</u>.

      With respect to Plaintiff's medical complaints and care, Defendants have submitted an affidavit from Cristal Wells, who attests that she is a nurse employed by the Sumter-Lee Regional



Detention Center, and that attached to her affidavit as Exhibit A are copies of Plaintiff's medical records. Wells attests that at the time of the incident at issue, the Detention Center had a contract with Southeastern to provide medical care, and that the Detention Center therefore had no involvement in the healthcare of inmates until June 2006, when that contract expired. Wells attests that she began her employment with the Detention Center in July 2006.

Wells attests that Plaintiff's medical records reflect that he received treatment after this incident on August 27, 2004, that he had only minor complaints at that time, and that his objective symptoms never indicated a need for any follow-up. Wells attests that Plaintiff's medical records reflect that his complaints could not even be verified by the medical staff. Wells attests that Plaintiff's medical records show that he was never denied any medical treatment, because each time he requested treatment, he was seen in medical.

Wells further attests that Plaintiff was discharged from the Detention Center in November 2004, following which he apparently went to Tuomey Hospital for chest complaints. LaCoste Affidavit, Exhibit A, Bates Nos. 7225-A-048 - 7225-A-051. These medical records reflect that Plaintiff complained of having back pains two days prior, which would have been over a month after this incident, and that a chest x-ray and EKG performed at that time were both normal. These medical records do not reflect any mention of a problem with Plaintiff's hand, nor do the Tuomey records substantiate any of Plaintiff's complaints.

With respect to Plaintiff's complaints about injuries to his right hand allegedly suffered during the August 27, 2004 incident, Wells attests that Plaintiff's medical records reflect that Plaintiff made no complaints of problems with his right hand until October 27, 2005, which was after he had been returned to the Detention Center over a year after this incident. At that time x-rays were



ordered, which showed a healed fracture in his hand. The doctor determined that no treatment was necessary. Wells attests that the first time Plaintiff complained to medical staff of pain in his hand and of chest pains was in a grievance dated June 29, 2006, following which he was seen in sick call on July 12, 2006. Wells attests that Plaintiff was found to have no symptoms or basis for his pain complaints, but he was nevertheless given ibuprofen and referred to a doctor. Wells attests that Plaintiff was then seen by a doctor on July 19, 2006, and was again found to be without objective symptoms. He was offered ibuprofen for his complaints.

With respect to Plaintiff's complaints about passing blood from his mouth and nose, Wells attests that Plaintiff's medical records reflect that he did not complain of these problems until a grievance filed on September 17, 2006 [LaCoste Affidavit, Exhibit A, Bates No. 7225-A-0802], almost two years after the incident at issue. Wells further attests that although Plaintiff has provided the Court with grievances dated September 11, 2006 and September 27, 2006, those grievances are not in his records. Wells also attests that the grievance dated September 27, 2006 refers to her examination of the Plaintiff on October 9, 2006. Wells attests that she did examine the Plaintiff on October 9, 2006 regarding his complaints of blood coming from his mouth and nose, but that she could not find any objective symptoms to match Plaintiff's complaints. LaCoste Affidavit, Exhibit A, Bates No. 7225-A-079. Moreover, he did not mention any problems with chest pains during this examination, nor could she find any evidence of a problem with chest pain. Plaintiff was seen again on October 12, 2006 and October 16, 2006 for these complaints, with minimal findings and no further treatment being determined to be necessary. LaCoste Affidavit, Exhibit A, Bates Nos. 7225-A-081, 7225-A-082, 7225-A-084. Plaintiff was seen again in medical on December 6, 2006 for additional complaints, but neither the nurse nor a doctor found any symptoms, although Plaintiff was again



offered ibuprofen for his complaints. See LaCoste Affidavit, Exhibit A, Bates No. 7225-A-089; see also generally, Wells Affidavit with attached Exhibit A.

Defendants have also offered an affidavit from Dr. Mark Bernard, who attests that he is a Board Certified medical doctor, that he has reviewed the medical records in this case, and that in his opinion Plaintiff has been treated in accordance with the appropriate medical standards throughout his periods of incarceration at the Sumter-Lee Regional Detention Center. Bernard further attests that if there had been a significant fire, resulting in a person having immediate complaints including shortness of breath, coughing, burning in the eyes and throat, and other physical findings requiring immediate medical attention, that those symptoms would have been evident but were not present in this case. Bernard further attests that Plaintiff's medical records reflect that he never complained of shortness of breath, and did not complain of a cough until over a year later, when it appears he was suffering from a cold. Bernard attests that even if such symptoms would have been present, they would be very short lived, and would not cause long lasting problems. Bernard attests that Plaintiff's complaints are not consistent with problems with smoke inhalation, as this would not cause chest pains or bleeding from the nose or mouth such as have been complained of by the Plaintiff, nor would these symptoms show up months and years later. Bernard attests that Plaintiff's records reflect that he was referred for a breathing study on January 23, 2007, which reflects that he might have asthma. However, asthma would not have been caused by the fire, nor would dyspnea be a complication of this fire. See generally, Bernard Affidavit.

Defendant Whitaker has submitted an affidavit wherein he attests that he is a Board Certified physician who at the time of the incident in question was assigned by his employer (apparently the Defendant Southeastern) to the Sumter-Lee Regional Detention Center. Whitaker



attests that Plaintiff was incarcerated at the Detention Center from July 10, 2004 though November 6, 2004. Plaintiff was then re-arrested on August 30, 2005, and (at least through the date of Whitaker's affidavit) remains incarcerated at the Detention Center.

Whitaker attests that on August 27, 2004 there was a small fire in the laundry area of the prison, which was near the recreation area of the Plaintiff's unit. Whitaker attests that, although the recreation area has high walls to prevent inmates from escaping, it is an outdoor facility. Whitaker attests that Plaintiff was seen by a nurse on August 28, 2004, and that the nurse's report showed "no SOB (shortness of breath), no redness of eyes, but complains of smoke inhalation....". LaCoste Affidavit, Exhibit A, Bates Nos. 7225-A-059. Whitaker attests that there were no objective symptoms to warrant further treatment. Whitaker attests that Plaintiff was then seen again the following day, August 29, 2004, after complaining of chest pains. Plaintiff's vital signs were found to be normal and no distress was noted by the nurse. LaCoste Affidavit, Exhibit A, Bates No. 7225-A-058.

Whitaker attests that on August 31, 2004, Plaintiff was brought to the medical unit complaining of a scratchy throat, which he attributed to inhaling smoke on August 27, 2004. The nurse found Plaintiff's throat to be "mildly red", but that Plaintiff had no swollen glands, no shortness of breath, and that his eyes and lungs were clear. LaCoste Affidavit, Exhibit A, Bates No. 7225-A-057. Plaintiff was given some Sudafed and Tylenol, but no further treatment was necessary. Whitaker attests that he examined the Plaintiff on October 1, 2004 for complaints of a constant ache in his chest since August 27, 2004. Whitaker attests that his examination revealed no respiratory symptoms, and that Plaintiff's chest was clear. Plaintiff's heart was normal and regular with no murmur. Plaintiff also complained about a subungal hematoma to his left thumb with nail dysplasia,



which he stated he got from banging on the cell door during the smoke episode.  Dr. Whitaker diagnosed Plaintiff with a chest ache, not consistent with smoke inhalation, and a dysplasic nail. Whitaker attests that both were minor problems, that no immediate further treatment was needed, and that Plaintiff was instructed to return to the clinic in two weeks.  <u>LaCoste Affidavit</u>, <u>Exhibit A</u>, Bates No. 7225-A-057

   Plaintiff thereafter returned on October 15, 2004, at which time an examination revealed "very good breath sounds....".  Whitaker attests that Plaintiff was prescribed some Atavan at night for his nerves, which was unrelated to this incident but due to his apparent hypersensitive nature, as well as Feldene (similar to Motrin).   Whitaker attests that Plaintiff was to return in two weeks, but that he did not return, as he was released from incarceration shortly after this visit. <u>LaCoste Affidavit</u>, <u>Exhibit A</u>, Bates No. 7225-A-056.

   Whitaker further attests that Plaintiff's medical records show that, subsequent to his release from jail, Plaintiff went to the emergency room at Tuomey Healthcare System on November 14, 2004 complaining of right side chest pain.  Whitaker attests that the emergency room doctor's notes show the same diagnosis that he had made, that it was noted that Plaintiff was in no acute distress, that his respiratory tract was clear with good air movement, that his cardiovascular system had a regular rate of rhythm with no murmur, and that all symptoms were normal except that Plaintiff complained of pain with anterior chest pressure.  The Plaintiff had a chest x-ray completed at that time, which the emergency room doctor found was normal.  Plaintiff was discharged with ibuprofen. <u>See</u> <u>Tuomey Healthcare Exhibits</u>.

   Plaintiff was later re-incarcerated on August 30, 2005, following which Dr. Whitaker saw the Plaintiff on September 27, 2005 for a rash on the back of his neck. <u>LaCoste Affidavit</u>, <u>Exhibit</u>



<u>A</u>, Bates No. 7225-A-007.  On November 3, 2005, Plaintiff returned to the clinic complaining that his right finger would not fully extend.  A bony knot distal R5 (metacarpal) was noted. <u>LaCoste Affidavit</u>, <u>Exhibit A</u>, Bates No. 7225-A-007. Dr. Whitaker saw Plaintiff again on January 17, 2006, a year and a half after the fire, for complaints of pain in his right fifth knuckle. <u>LaCoste Affidavit</u>, <u>Exhibit A</u>, Bates No. 7225-A-007. With respect to Plaintiff's prior complaint concerning his right hand from November 3, 2005, an x-ray was performed on March 29, 2006, confirming an old healed fracture of the fifth metacarpal bone of the right hand. <u>LaCoste Affidavit</u>, <u>Exhibit A</u>, Bates No. 7225-A-017. No treatment for this injury was necessary, since Plaintiff's injury had healed. Whitaker further attests that, contrary to Plaintiff's claim in his Complaint, no operation was necessary for this well healed fracture, nor does Dr. Whitaker believe any operation is needed for Plaintiff's complaints concerning his knuckle joint.

With respect to Plaintiff's complaint that he is currently spitting up blood, Whitaker attests that Plaintiff showed no signs of passing blood through his mouth or nose immediately after his exposure to the smoke in August 2004, and in fact suffered no symptoms compatible with smoke inhalation at the time of this incident.  Whitaker attests that Plaintiff would not be exhibiting any such symptoms at this late date which could be attributed to allegedly being exposed to smoke in August 2004.  In sum, Dr. Whitaker attests that Plaintiff was examined properly, and was treated properly following the incident of August 2004, that Plaintiff suffered no damages from smoke inhalation, nor did he suffer any treatable injury to his hand.  <u>See</u> <u>generally</u>, <u>Whitaker Affidavit</u>.

In addition to the evidence from Dr. Whitaker, the Defendants have also submitted a copy of the deposition of Dr. Samuel Corbin, a Sumter family physician who had reviewed Plaintiff's condition at his request. Dr. Corbin examined the Plaintiff on two occasions, January 15,



2007 and February 6, 2007.  Dr. Corbin did not find any overt symptoms or signs of lung problems, or anything that he would interpret as being abnormal.  <u>Corbin Deposition</u>, pp. 20, 41-42.  Dr. Corbin had a pulmonary function test performed, following which he assessed a decreased pulmonary function, although he conceded that he was frankly confused by the results of the pulmonary study. <u>Id</u>, pp. 42, 45-46.  Dr. Corbin further testified that he was not satisfied that he even understood what the findings were of the pulmonary function study; <u>Id</u>, p. 46; but that Plaintiff nevertheless appeared stable and unchanged in regards to his pulmonary status.  <u>Id</u>, p. 49.  Dr. Corbin testified that he did not prescribe any additional medications for any type of lung or pulmonary problem. <u>Id</u>, p. 50.

On cross-examination by the Plaintiff, Dr. Corbin testified that his treatment of someone who had been exposed to smoke inhalation as a result of fire would probably be to obtain x-rays of the person's chest, and that if the chest x-ray was unremarkable, he would probably not have done anything else. <u>Id</u>, p. 59.   With respect to Plaintiff's complaints concerning his hand, Plaintiff had Dr. Corbin review forms signed by Dr. Brandon Fites, an orthopaedic specialist, who had opined that it would be "best" for Plaintiff to have his hand problem with the fifth metacarpal deformity surgically corrected after he got out of the prison system, but that he did not believe a jail environment would be conducive to good wound care. <u>Id</u>, pp. 61-62.  Dr. Fites noted no problems with Plaintiff's left hand. <u>Id</u>, p. 63.  In conclusion (on redirect), Dr. Corbin testified that he could not give an opinion based on a reasonable degree of medical certainty as to when any of the medical issues Plaintiff was complaining of had occurred.  He also testified that his assessment or diagnosis of a decreased pulmonary function was not based on the pulmonary function evaluation, but on Plaintiff's self report to Dr. Corbin about his condition. <u>Id</u>, p. 66.

In opposition to the motion for summary judgment, Plaintiff has submitted several

13



exhibits. One of these exhibits (apparently part of a jail procedure manual) provides that, in general, staff are to release inmates from cells when the circumstances of a fire (i.e., the heat, smoke, etc.) or the extent of an adjacent fire make it evident that to allow the inmates to remain in their cells would constitute a life threatening situation. <u>See</u> Bates No. 7225-D-004; <u>see also</u> Bates No. 7225-D-005. Another exhibit states that drills will be conducted on a regular schedule, with a handwritten notation in the margin (apparently by the Plaintiff) that "this has never been done and I have been here two years." <u>Id</u>, at 7225-D-006. Another part of this manual provides that "medical examination and care will be provided as soon as possible after those involved in a fire have been removed to safety." <u>Id</u>, at 7225-D-007.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a <u>pro se</u> litigant to allow the development of a potentially meritorious case, <u>see</u> <u>Cruz v. Beto</u>, 405 U.S. 319 (1972); <u>Haines v. Kerner</u>, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. <u>Weller v. Dep't of Social Services</u>, 901 F.2d 387 (4th Cir. 1990).

14



# I.

## (Medical Claim)

After review of the evidence and arguments submitted, the undersigned finds and concludes that the evidence before the Court is not sufficient to create a genuine issue of fact as to whether any named Defendant[3] violated Plaintiff's constitutional right to proper medical care, and that this claim is subject to dismissal.  In order to avoid summary judgment, Plaintiff must present sufficient evidence to raise a material issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977) ; Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975).[4] In deciding this issue, it is important to remember that whether or not Plaintiff was provided with the care he *desired* is immaterial. Jackson v. Fair, 846 F.2d 811, 817 (1st Cir. 1988) [the Constitution "does not guarantee to a prisoner the treatment of his choice."]; see also Brown v. Thompson, 868 F.Supp. 326, 329-330, n. 2 (S.D.Ga. 1994).

---

[3]The various Defendants have submitted many grounds for dismissal of this action, including the argument that some or even most of the named Defendants are entitled to dismissal because they had nothing to do with the conditions of Plaintiff's confinement at the Detention Center, or had anything to do with his medical care.  Indeed, Plaintiff himself (as a postscript to his Complaint) states that he intended to file another claim form detailing specific allegations against several of the Defendants named in this action, but which (he apparently conceded) were not contained in the allegations of his original Complaint. However, in light of the undersigned's finding that Plaintiff's claims are subject to dismissal on the merits as discussed hereinabove, infra, a separate discussion and analysis of the Defendants' other arguments regarding Plaintiff's failure to state a claim, immunity, entitlement to respondeat superior dismissal, etc., has not been conducted.

[4]While Plaintiff was only a pretrial detainee during the time period at issue, the deliberate indifference standard applied to convicted prisoners still applies. See Hill v. Nicodemus, 979 F.2d 987, 991-992 (4th Cir. 1992); see also Bell v. Wolfish, 441 U.S. 520, 535, n. 16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1998) [holding that the Fourteenth Amendment guarantees at least Eighth Amendment protections].

15



Here, the Defendants have submitted copies of Plaintiff's medical records as well as affidavits and testimony from Board Certified physicians detailing the medical care and treatment Plaintiff received during the relevant time period (and indeed is continuing to receive), and opining that Plaintiff's medical problems and complaints have been timely evaluated and appropriately treated, that he is not experiencing any serious or life threatening medical conditions, and that the care Plaintiff has received meets the appropriate standard of care for someone with his complaints and in his medical condition.  In contrast to the Defendants' evidence, Plaintiff has provided no evidence to support the general and conclusory claims in his Complaint that any named Defendant has been deliberately indifferent to his serious medical needs.  Even Dr. Corbin, who Plaintiff offers as his medical expert, did not testify that Plaintiff failed to receive the proper standard of care, or that indeed Plaintiff is suffering from any serious condition.

The Court is not required to simply accept Plaintiff's conclusory claims and statements without any supporting evidence.  House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim]; see also Estelle, 429 U.S. at 105; Harris v. Thigpen, 941 F.2d 1495, 1505-1507 (11th Cir. 1991); Papasan v. Allain, 478 U.S. 265, 286 (1986) [Courts need not assume the truth of legal conclusions couched as factual allegations]; Bender v. Surburban Hospital, Inc., 159 F.3d 186 (4th Cir. 1998); Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"]; Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995) [explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be



within the range of reasonable probability" and that "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary" (internal quotation marks omitted)]. While Plaintiff obviously feels strongly about the course of treatment he should have received for his complaints, he is not a doctor, and his lay opinion that he should have received or should be receiving additional or different treatment than the treatment he was provided is not in and of itself sufficient to create a genuine issue of fact as to whether any medical professional was deliberately indifferent to a serious medical condition. See Scheckells v. Goord, 423 F.supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]; see also Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence, and contrary to the medical evidence on record, insufficient to defeat summary judgment on deliberate indifference claim]). The actual *medical evidence* before the Court shows that Plaintiff received and has continued to receive ongoing treatment for his medical complaints, and the fact that Plaintiff may disagree with medical personnel about the seriousness of his medical complaints or the course of his treatment does not constitute deliberate indifference on the part of the medical personnel. Lamb v. Maschner, 633 F.Supp. 351, 353 (D.Kan. 1986); see Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997) ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"], quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994); Jackson, 846 F.2d at 817 ["Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice."].

17



Even if the Court were to find that the evidence was sufficient to create an issue of fact as to whether any named Defendant was *negligent* with respect to their treatment of the Plaintiff (a finding which the undersigned does not make), Plaintiff's claim would still be subject to dismissal, as negligent or incorrect medical treatment is not actionable under 42 U.S.C. § 1983. Estelle, 429 U.S. at 106. Negligence, in general, is not actionable under 42 U.S.C. § 1983. See Daniels v. Williams, 474 U.S. 327, 328-336 & n. 3 (1986); Davidson v. Cannon, 474 U.S. 344, 345-348 (1986); Ruefly v. Landon, 825 F.2d 792, 793-794 (4th Cir. 1987). Similarly, medical malpractice is not actionable under 42 U.S.C. § 1983. Estelle, 429 U.S. at 106 ["medical malpractice does not become a constitutional violation merely because the victim is a prisoner."].

Therefore, Plaintiff's § 1983 claim that he received constitutionally deficient medical care should be dismissed.

## II.

### (Safety Issue)

With respect to Plaintiff's claim that he was "abandoned" by the Defendant Brunson or other correctional officers, in order to proceed with this claim Plaintiff must produce evidence sufficient to give rise to a genuine issue of fact as to whether any named Defendant was deliberately indifferent to an excessive risk to his health or safety. See Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"](quoting Farmer, 114 S.Ct. at 1979). Plaintiff has failed to present any such evidence. Rather, Plaintiff simply claims in a general and conclusory fashion that he was in danger from the laundry room fire on August 27, 2004, and that the Defendant's failure to release him and the other inmates from the recreational yard resulted in his inhaling toxic smoke and hurting



his hand when he banged on the door to try to get out.

However, as previously noted, Plaintiff has presented no evidence to support his claim that he was subjected to levels of toxic smoke on that date, and even assuming the Court could make a finding that Brunson was deliberately indifferent to Plaintiff's safety when she failed to open the recreation yard cell door to let the inmates out, Plaintiff's hand injury is clearly shown in the medical evidence to have been, at best, de minimis. See Norman v. Taylor, 25 F.3d at 1263 [absent the most extraordinary circumstances, a plaintiff cannot prevail on an Eighth Amendment claim if his injury de minimis]; See also Thaddeus-X v. Wozniak, No. 99-1720, 2000 WL 712383 at **3 (6th Cir. May 23, 2000)[Plaintiff must show he suffered more than de minimis injury]; Harper v. Showers, 174 F.3d 716, 719 (5th Cir. 1999)[Without proof of more than de minimis physical injury, Plaintiff cannot maintain his claim]; *cf.* Griffin v. DeRosa, 153 Fed.Appx. 851, 852-853 (3rd Cir. Nov. 3, 2005) [finding plaintiff's allegations insufficient to show that prison officials were deliberately indifferent to prisoner's health or safety, as required to state Eighth Amendment claim for failure to protect].

Further, in contrast to the Plaintiff's conclusory and unsupported claims about the severity of the fire on August 27, 2004, Defendants have submitted evidence to show that there was only a minor fire, which produced a minor amount of smoke into an open yard, and that no inmate in the recreation yard was ever in any type of danger whatsoever. Plaintiff has presented no evidence to contradict any of the Defendants' evidence, and indeed it does not appear that Plaintiff ever even went into the laundry to observe the source of the fire, nor has he presented any evidence from any other competent source to contradict the Defendants' evidence concerning the extent and severity of this fire.

Therefore, Plaintiff has failed to present a genuine issue of fact as to whether any



named Defendant was deliberately indifferent to any excessive risk to his health or safety, and this claim should therefore be dismissed. See Levy, No. 96-4705, 1997 WL 112833 ["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"](quoting Farmer, 114 S.Ct. 1970, 1979 (1994); Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"].

### III.

### (Violation of Prison Rules or Procedures)

Finally, Plaintiff appears to argue in his material filed in opposition to Defendants' motions for summary judgment that some or all of the Defendants have failed to follow their own prison policies, procedures or guidelines with respect to having regular fire drills, removing of prisoners during emergencies, etc. However, to the extent Plaintiff has intended to assert such a claim, it fails to set forth a claim cognizable under § 1983, which is the procedural mechanism through which Congress provided a private civil cause of action based on allegations of *federal* constitutional violations by persons acting under color of state law. See Jennings v. Davis, 476 F.2d 1271 (8th Cir. 1973).

The undersigned has already concluded that Plaintiff has failed to set forth evidence sufficient to give rise to a claim of federal or constitutional magnitude. Even if the Court were to accept Plaintiff's premise that the Detention Center was not following its own internal rules and procedures with respect to how often they conducted fire drills and the like, § 1983 simply does not impose liability for violations of duties of care arising under state, local or institutional policies, procedures or law. Johnson v. S.C. Dep't of Corrections, No. 06-2062, 2007 WL 904826 at *12



(D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that defendants did not follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing <u>Riccio v. Fairfax, Virginia</u>, 907 F.2d 1459, 1469 (4th Cir. 1990) [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]; <u>Keeler v. Pea</u>, 782 F.supp. 42, 44 (D.S.C. 1992) [violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983]); <u>DeShaney v. Winnebago County Dep't of Social Servs.</u>, 489 U.S. 189, 200-203 (1989); <u>Daniels v. Williams</u>, 474 U.S. at 328-336 & n. 3 [Jailers may owe a special duty of care to those in their custody under state tort law,...but...we reject the contention that the Due Process Clause of the Fourteenth Amendment embraces such a tort law concept]; <u>Baker v. McClellan</u>, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care]; <u>Paul v. Davis</u>, 424 U.S. 693, 697 (1976); <u>see</u> <u>also</u> <u>Brooks v. Celeste</u>, 39 F.3d 125 (6th Cir. 1994); <u>Sellers v. Henman</u>, 41 F.3d 1100 (7th Cir. 1994); <u>White v. Napoleon</u>, 897 F.2d 103, 108-109 (3d Cir. 1990); <u>Smart v. Villar</u>, 547 F.2d 112 (10th Cir. 1976) [affirming summary dismissal].   Hence, while Plaintiff may or may not have a common law claim with respect to these complaints, or some further administrative remedy to pursue, he may not maintain this claim in this Court under § 1983 based on these allegations.

## Conclusion

Summary judgment is appropriate where the record taken as a hold could not lead a rational trier of fact to find for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).  Based on the foregoing, it is recommended that the Defendants'

21



motions for summary judgment be **granted**, and that this case be **dismissed.**

The parties are referred to the Notice Page attached hereto.



_____
Bristow Marchant
United States Magistrate Judge

Columbia, South Carolina

September 4, 2007

22

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).



23